Gregory Buppert (Tenn. BPR No. 024340[1])
*Pro hac vice* application filed.
Michael Senatore (D.C. Bar No. 453116)
*Pro hac vice* application forthcoming.
DEFENDERS OF WILDLIFE
1130 17th Street, N.W.
Washington, DC 20036-0046
Telephone: 202.682.9400
Fax: 202.682.1131
gbuppert@defenders.org
msenatore@defenders.org
*Counsel for Plaintiffs.*



# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, SKY ISLAND ALLIANCE, and PATAGONIA AREA RESOURCE ALLIANCE, | ) <br> ) <br> ) |
| Plaintiffs, | ) Civ. No. _____ <br> ) <br> ) Complaint for |
| v. | ) Declaratory and <br> ) Injunctive Relief for |
| UNITED STATES FOREST SERVICE, TOM TIDWELL, Chief, U.S. Forest Service JIM UPCHURCH, Forest Supervisor, Coronado National Forest, and KATHLEEN NELSON, Acting District Ranger, Sierra Vista Ranger District, | ) Violations of NEPA, <br> ) 42 U.S.C. § 4321, *et.seq.* <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

CIV 11-830 TUC JM

---

[1] Application for admission to the Bar of the District of Columbia pending; practice limited to the courts of the United States as provide in D.C. App. Rule 49(c).

1

## COMPLAINT

### INTRODUCTION

1.     This case challenges the Forest Service's approval of a mineral exploration drilling project — a drilling project that will operate 24 hours a day, 7 days a week, for 300 consecutive days to install 15 drill holes on national forest lands in the Patagonia Mountains — as a categorical exclusion to review under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*. (hereafter, "NEPA"). The approved drilling project, known as the Hardshell Minerals Exploration Project (hereafter, the "Hardshell Project"), is located in the Coronado National Forest in southern Arizona, which is part of the "Sky Islands" region straddling the United States – Mexico border. The Sky Islands contain a unique and biologically diverse desert and montane ecosystem that provides habitat for at least twenty-eight threatened and endangered species, including jaguar, ocelot, Mexican spotted owl, and lesser long-nosed bat. The proponent, Arizona Minerals, Inc., a subsidiary of Wildcat Silver Corp., has conducted exploratory drilling operations on its private lands adjacent to the approved site for the Hardshell Project, decimating the native vegetation, causing erosion and a wildfire, and resulting in the discharge of drilling fluids to nearby drainages, but the Forest Service ignored these significant impacts.

2

1    Furthermore, the Forest Service's analysis of the Hardshell Project's impacts to

2    threatened and endangered species was based on an incomplete understanding of

3    the value of habitat in the project area, used outdated and incorrect information,

4    and ignored key impacts such as illumination.  As a result, the Forest Service failed

5    to accurately assess the impacts of the Project to threatened and endangered

6    species.  For these reasons and others set forth herein, the plaintiffs seek an order

7    vacating the Forest Service's approval of the Hardshell Project and remanding the

8    matter back to the agency for additional analysis of the Project's environmental

9    impacts, an injunction halting the Project until the defendants' NEPA violations

10   are remedied, and such other relief as is requested herein.

11                              **JURISDICTION AND VENUE**

12   2.      The plaintiffs bring their claims for violations of NEPA pursuant to the

13   judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701, *et*

14   *seq*. (hereafter, "APA").  This Court has jurisdiction over this action pursuant to

15   28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a

16   defendant, and it arises under the laws of the United States, including the APA, 5

17   U.S.C. §§ 701 *et seq*. and NEPA, 42 U.S.C. §§ 4321, *et seq*.

18   3.      Venue is proper in this Court under 28 U.S.C. § 1391(e), because the actions

19   complained of arose in this District, two of the plaintiffs – Sky Island Alliance and

20   Patagonia Area Resource Alliance – have their principal place of business in this

3

1  District, and one plaintiff – Defenders of Wildlife – has a field office in this

2  District.  The Sierra Vista Ranger District office is also located within this District.

3                                             **PARTIES**

4  4.      Defenders of Wildlife ("Defenders") is a national nonprofit organization

5  dedicated to the protection and restoration of all native wild animals and plants in

6  their natural communities.  Based in Washington, D.C., and with a regional office

7  in Tucson, Arizona, Defenders has over 438,000 members across the nation,

8  including over 10,000 members in Arizona.  From the Southwest office, Defenders

9  works to restore and protect rare species and ecosystem functions in the

10  southwestern United States and northern Mexico.  This includes a focus in part on

11  the conservation of the "Sky Island" ecosystems and the wildlife that depend upon

12  those ecosystems.   Thus, Defenders has organizational and membership-based

13  interest in the preservation and conservation of the Coronado National Forest and

14  the Patagonia Mountains, and the wildlife that depends upon the habitat provided

15  by these public lands.  Defenders works in Sonora, Mexico and in southern

16  Arizona and New Mexico to conserve the world's northernmost population of

17  jaguars and to study and protect the corridors they use to cross into the United

18  States.  As part of this effort, Defenders has participated in key jaguar conservation

19  initiatives to protect jaguars in their northern range, including an ongoing jaguar

20  guardian/monitoring program, a landowner camera contest, and establishment of

4

1   the Northern Jaguar Reserve.  A Southwest office staff member also sits on the

2   Recovery Implementation Team for ocelots, which have been documented in the

3   Coronado National Forest.  Defenders' Southwest staff members have also been

4   involved in a collaborative effort with state and federal agencies, counties, and

5   other conservation organizations to identify and map multi-species wildlife

6   linkages across Arizona, including linkages identified on and adjacent to the

7   Coronado National Forest.

8   5.   Sky Island Alliance ("SIA") is a non-profit conservation organization

9   dedicated to the protection and restoration of the rich natural heritage of native

10  species and habitats in the Sky Island region of the southwestern United States and

11  northwestern Mexico.  SIA works with many partners to establish protected areas,

12  restore healthy landscapes, and promote public appreciation of the region's unique

13  biological diversity.  For 20 years, SIA has been working with numerous partners

14  to build resilience in the region through protection and restoration of habitat cores

15  and wildlife corridors, safeguarding and improving wildlife movement across the

16  landscape.  As part of this work, SIA closely monitors harmful land use activities

17  on the Coronado National Forest, including mineral exploration and mining

18  operations, which are known to degrade habitat and disrupt wildlife migration.  In

19  addition, SIA staff and volunteers have conducted substantial on-the-ground work

20  in the Patagonia Mountains and Huachuca Ecology Management Area over the

5

1   past ten years, including habitat restoration, riparian area inventories, road

2   inventories, and road closures.  SIA also works closely with Mexican and U.S.

3   landowners in and adjacent to the Patagonia Mountains on jaguar and ocelot

4   conservation efforts, and SIA staff were active participants in the now-disbanded

5   Arizona-New Mexico Jaguar Conservation Team.

6   6.     The Patagonia Area Resource Alliance ("PARA") is an unincorporated

7   association of volunteer community members dedicated to protecting and

8   preserving the Patagonia, Arizona area.  PARA is a watchdog organization that

9   monitors the activities of industrial developers such as mining corporations, as well

10  as government agencies, to make sure their actions have long-term, sustainable

11  benefits to our public lands, our watershed, and our town.   PARA is also

12  committed to outreach and education within the Patagonia community on the

13  potential negative impacts hard rock mining could have on the surrounding

14  ecosystems and the region's growing eco-tourism based economy.

15  7.     Plaintiffs' members live near and regularly visit the Coronado National

16  Forest, and specifically the Patagonia Mountains, for wildlife observation,

17  recreation, scientific research, habitat restoration activities, and other uses.  These

18  members have aesthetic, educational, professional, health, and spiritual interests

19  that will be harmed by the adverse environmental impacts resulting from the

6

1    defendants' authorization of the Hardshell Project, as well as by the defendants'

2    failure to comply with NEPA when approving this Project.

3    8.     Defendant Jim Upchurch is sued in his official capacity as Forest Supervisor

4    of the Coronado National Forest.   Defendant Kathleen Nelson is sued in her

5    official capacity as Acting District Ranger for the Sierra Vista Ranger District on

6    the Coronado National Forest.

7    9.     Defendant Tom Tidwell is sued in his official capacity as Chief of the

8    United States Forest Service, an agency of the United States Department of

9    Agriculture.  The United States Forest Service and its officers are responsible for

10   the lawful management of the Coronado National Forest.

11                        **FACTUAL AND LEGAL FRAMEWORK**

12        **A. The Coronado National Forest and the Patagonia Mountains.**

13   10.    The Coronado National Forest includes twelve forested mountain ranges

14   known as "Sky Islands" because they rise above a "sea" of desert and grasslands.

15   The topographic variability of the region, the relative isolation of the individual

16   mountain ranges, and the convergence of tropical and temperate ecosystems and

17   forest and desert ecosystems makes the Coronado one of the most biologically

18   diverse areas in the United States.   More than half of all the North American bird

19   species, 29 bat species, over 3000 species of plants, and 104 species of mammals

20   can be found in the Sky Islands.   In addition, there are at least 28 threatened or

7

1   endangered species, listed pursuant to the Endangered Species Act, 16 U.S.C. §

2   1531, *et seq*., that are known to exist in the Sky Islands.

3   11.    The Coronado National Forest also serves as a key habitat linkage between

4   the United States and Mexico.  This ecosystem linkage is increasingly important

5   for cross-border wildlife populations because of the construction of the U.S.-

6   Mexico border fence and other border infrastructure, which has reduced the

7   number of undisturbed corridors available for wildlife travel, and because of the

8   range shifts expected for many wildlife species as a result of climate change.

9   12.    The Huachuca Sky Island is one of three Sky Islands intersecting the U.S.-

10   Mexico border. The Huachuca Sky Island, also referred to by the Forest Service as

11   the Huachuca Ecosystem Management Area, is approximately horseshoe-shaped

12   and contains the Huachuca Mountains in the east, the Canelo Hills in the north, and

13   the Patagonia Mountains in the west.  The Patagonia Mountains extend from near

14   the town of Patagonia, Arizona, into Mexico, approximately fifteen miles south.

15   The Patagonia Mountains continue into Mexico as the Sierra San Antonio

16   mountain range.   The Patagonia Mountains provide a direct link between the

17   wildlife habitat in the Coronado National Forest and habitat in the mountain ranges

18   in Mexico.

19   13.    Increased development along the U.S.-Mexico border has significantly

20   reduced the number of unimpeded wildlife migration corridors between the United

8

States and Mexico.  The linkage between the Patagonia Mountains and the Sierra San Antonio is one of three remaining corridors in southeast Arizona where human development and border surveillance infrastructure do not impede wildlife migration.

14.    The Patagonia Mountains are known or suspected to support numerous imperiled species, including the federally listed jaguar, ocelot, lesser long-nosed bat, and Mexican spotted owl.  The area is also home to at least thirty-four species that the U.S. Forest Service has designated as "sensitive."  In addition, the National Audubon Society recently proposed designating the Patagonia Mountains an Important Bird Area—a designation granted for sites that provide essential habitat for one or more species of bird.

15.    Like many areas in the Sky Islands, the Patagonia Mountains were historically mined for metals, including copper, silver, and gold.  Historical mining operations occurred at a greatly reduced scale when compared with modern practices.  Mining ended in the Hardshell area more than 100 years ago, and today nearby towns are not only no longer dependent on mining, but have developed local economies that depend on outdoor recreation, which in turn depends on the beauty of the surrounding mountain ranges and their rich diversity of flora and fauna.

**B. Jaguar.**

16.     The jaguar (*Panthera onca*) is a large and wide-ranging species of cat native to the Western hemisphere.  The jaguar's range extends from southern Arizona and New Mexico south throughout North, Central, and South America.   The home range for male jaguars is between nineteen and fifty-three square miles, and the home range for female jaguars is between ten and thirty-seven square miles; however, jaguars have also been observed roaming more broadly, with movements of 500 miles having been recorded.   Jaguars are habitat generalists that utilize a wide range of habitat types.

17.     The jaguar is thought to be native to large swaths of the southern United States.   While the jaguar was largely eliminated from its historical range within the United States by the mid-20th century, the past decade has witnessed a remarkable resurgence of the great cat, and observers have repeatedly documented individual jaguars that appear to have taken up residence within the borderlands area.   As a result of the jaguar's suspected recolonization of its historical habitats, the United States Fish and Wildlife Service (hereafter, the "FWS") listed jaguars within the United States as endangered under the ESA in 1997.   In response to a 2009 court decision from the United States District Court for the District of Arizona, FWS reassessed its determination that a critical habitat designation for the jaguar was not prudent and, in 2010, concluded that a critical habitat designation is indeed

10

1   prudent.  FWS has announced that it will propose a critical habitat designation in

2   Spring 2012.

3   18.   Jaguar presence in Arizona, and specifically in the Patagonia Mountains,

4   during the 20th century is well-documented.  Historical records show that at least

5   six jaguars were killed or photographed in the Patagonia Mountains between 1904

6   and 1965: two in 1904, one (perhaps two) in 1926, one in 1932 or 33, one in 1948,

7   and one in 1965.  In addition, there have been many documented sightings in the

8   past decade as close as twenty miles from the Patagonia Mountains.  From 2001 to

9   2007, biologists monitored at least two jaguars on several mountain ranges thirty to

10  sixty miles west of the Patagonia Mountains.   In 2010 and 2011, Sky Island

11  Alliance documented two different jaguars thirty miles south of the Patagonia

12  Mountains in the Sierra Azul Mountains.   In June 2011, a U.S. Border Patrol

13  helicopter pilot reported a jaguar sighting approximately twenty miles from the

14  Patagonia Mountains in the Santa Rita Mountains — the adjacent mountain range

15  directly to the north.  Most recently, on November 19, 2011, the Arizona Game

16  and Fish Department confirmed a hunter's jaguar sighting southeast of Tucson,

17  approximately thirty miles northeast of the Patagonia Mountains.

18  19.   The Patagonia Mountains are suitable habitat for the jaguar, and the Arizona

19  Game and Fish Department in 2003 identified the range as occurring within a

20  "hotspot" for jaguar distribution, noting that it was part of an area where 55% of all

11

1   jaguar sightings had occurred in the 20th century.  The Arizona Game and Fish

2   Department included the Patagonia Mountains in a zone identified as "the most

3   suitable conservation area" for jaguars within the state of Arizona.  All recent

4   documented sightings of jaguars have occurred in mountain ranges which encircle

5   the Patagonia Mountains.

6   20.    The Patagonia Mountains provide an important wildlife migration corridor

7   for jaguars moving north through the borderlands from Mexico into Arizona, and

8   jaguars documented in Arizona are likely using habitat in the Patagonia Mountains.

9   **C. Ocelot.**

10   21.    The ocelot (*Leopardus pardalis*) is a small, tawny-colored cat with black-

11   bordered, chain-like spots marking its sides.  Ocelots are much smaller than

12   jaguars, growing to roughly twenty to forty inches long, and while they sometimes

13   prey on young deer, most of their diet consists of smaller vertebrates, including

14   rabbits, rodents, birds, and lizards.  The ocelot's range extends from southern

15   Arizona and southern Texas through North, Central, and South America into

16   northern Argentina and Uruguay.  Ocelot habitat varies greatly throughout this

17   broad range, from tropical rainforest, pine forest, gallery forest, riparian forest,

18   semideciduous forest, and dry tropical forest, to savanna, shrublands, and

19   marshlands.  The population and habitat characteristics for ocelots in southern

1    Arizona are similar to those of the jaguar in this area, and the two species have

2    reappeared in close parallel to one another in the Coronado National Forest.

3    22.    Despite the fact that ocelots are notoriously difficult to detect, particularly in

4    low densities such as they probably exist in their northern range, there have been

5    multiple sightings near the Patagonia Mountains.   There is a known breeding

6    population of ocelots in Sonora, Mexico, thirty miles south of the Patagonia range.

7    In November 2009, Sky Island Alliance documented the first live ocelot in

8    approximately forty years in southern Arizona with the use of a remote camera in a

9    mountain range approximately thirty miles from the Patagonia Mountains.

10   Additionally, in 2011, the Department of Arizona Game and Fish documented

11   ocelots on two different occasions in the Huachuca Mountains, which is in the

12   same Sky Island and Ecosystem Management Area as the Patagonia Mountains.  In

13   2009, the United States Border Patrol reported a female ocelot with kittens in the

14   Patagonia Mountains; that report was not confirmed by photographic evidence.

15   23.    The Patagonia Mountains provide an important wildlife migration corridor

16   for ocelots moving north through the borderlands from Mexico into Arizona, and

17   ocelots documented in Arizona are likely using habitat in the Patagonia Mountains.

18   The recent ocelot sightings reveal the geographic distribution of an established

19   trans-boundary population.

20

13

### D. Mexican Spotted Owl.

24.    The Mexican spotted owl (*Strix occidentalis lucida*) is a medium-sized owl which occurs in forested mountains and canyonlands throughout the Southwestern United States and Mexico.   Mexican spotted owls consume a variety of prey, including small- and medium-sized rodents, bats, birds, reptiles, and arthropods. The Mexican spotted owl was listed as threatened under the ESA in 1993, and critical habitat was designated in 2004.   A Recovery Plan was completed for the Mexican spotted owl in 1995, and a draft version of an updated Recovery Plan was released earlier this year.

25.    The Recovery Plans designate Protected Activity Centers, which are areas known to be present or historical nest and/or roost sites.   FWS recommends that these areas contain at least 600 acres of habitat, including a 100-acre "core area" that receives maximum protection, in order to sustain and enhance areas that are presently, recently, or historically occupied by breeding Mexican spotted owls. Forest management activities should be limited within Protected Activity Centers, and generally should only be undertaken in consultation with FWS.   Outside of Protected Activity Centers, areas containing certain constituent elements of critical habitat are determined to be "Recovery" or "Restricted" habitat.

26.    There are several Protected Activity Centers in the Patagonia Mountains, the closest one being less than a mile from the Hardshell Project.   Additionally, habitat

14

1   in the project area contains the constituent elements of critical habitat, qualifying it

2   as "Recovery" or "Restricted" habitat.

3       **E. Lesser Long-Nosed Bat.**

4   27.     The lesser long-nosed bat (*Leptonycteris curasoae yerbabuenae*) is an

5   herbivorous bat that migrates seasonally from Mexico to southern Arizona and

6   southwestern New Mexico.  The species feeds primarily on the nectar, pollen, and

7   fruit of columnar cacti and agave plants and, in turn, provides an important

8   ecosystem service as a pollinator and seed disperser for these species. The lesser

9   long-nosed bat typically resides in Arizona from early April through October.  The

10  species roosts in large maternity colonies near columnar cacti food resources until

11  the young are weaned in July or August, at which time the colonies disperse into

12  post-maternity roosts near agave food resources.  Suitable habitat for the lesser

13  long-nosed bat is characterized by both adequate food resources and suitable day

14  roosts.  Caves and abandoned mines serve as important day roosts for the species

15  throughout its range.

16  28.     The Patagonia Bat Cave is a confirmed post-maternity roost for the lesser

17  long-nosed bat located in the Patagonia Mountains, approximately five miles

18  northeast of the Hardshell Project. In late August 2004, the Patagonia Bat Cave

19  was home to over 20,000 lesser long-nosed bats.  In 2008, the Forest Service found

20  that lesser long-nosed bats were likely to forage on agave in Humboldt Canyon,

1   also located approximately five miles from the Patagonia Bat Cave.  In addition to

2   the Patagonia Bat Cave, there are multiple abandoned mines in the Patagonia

3   Mountains that represent potential post-maternity roost sites.

4   29.    The lesser long-nosed bat is highly sensitive to human disturbance.  Studies

5   of lesser long-nosed bat in both Arizona and Mexico have shown that even one

6   short visit from a human is enough to cause a high proportion of bats to move to

7   another roost.  Re-occupancy of a vacated roost is not certain.  In evaluating prior

8   proposed drilling projects, the Forest Service has concluded that night-time drilling

9   activities from July through August may disturb the foraging activity of lesser

10  long-nosed bats at least five miles away from the Patagonia Bat Cave.

11  **F. The Existing Habitat in the Hardshell Project Area.**

12  30.    The dominant vegetation community in the vicinity of the Hardshell Project

13  is Madrean Evergreen Oak woodland.  However, the area is topologically diverse

14  and the plant communities vary depending on slope, aspect, and soils.

15  31.    The elevations range from about 5000 feet to over 6000 feet on the ridges.

16  The ridges in the vicinity of the Project are open savannah, with good grass cover,

17  much yucca and agave, and scattered junipers.  The percent canopy cover on the

18  ridges varies from approximately 20-40%.  Most of the trees on both ridges are

19  fifteen to twenty feet in height and have diameters mostly under fifteen inches at

20  breast height ("dbh").

16

32.    The south-facing slopes in the vicinity of the Project are grassy with short, scattered trees and shrubs and canopy cover mostly less than 40%.

33.    The north-facing slopes in the vicinity of the Project are more heavily vegetated with canopy cover near the top as described above for ridges and increasing tree density, height, and canopy cover as the hills are descended.  Mid-ridge, north-slope woodlands are mixed oak, pine, and juniper, and there is often heavy shrub cover between the trees.  Canopy cover in the mid-slopes on the north slopes is mostly 40-60% and most canopy trees are ten to fifteen inches dbh.

34.    The densest tree cover in the vicinity of the Project is at the base of the hills, on north-facing slopes approaching the drainage bottoms.  Here the plant species composition is similar to that described for north-facing slopes except the trees are larger (mostly twelve to sixteen inches dbh and fifteen to twenty-five feet high) and the canopy is denser (canopy cover 50-80%).

**G. The Hardshell Project.**

35.    The Forest Service authorized Arizona Minerals, Inc., a subsidiary of Wildcat Silver Corp., (hereafter "AMI" or the "Company") to conduct exploratory drilling on federal lands in the Patagonia Mountains approximately 6.5 miles southeast of the town of Patagonia, Arizona.  The Hardshell Project site consists of 3100 acres of unpatented mining claims on Federal land in the Coronado National Forest, surrounding 154 acres of patented mining claims on private land owned by

1  the Company.  The Hardshell Project will involve four drillings rigs which will

2  drill up to fifteen bore holes to maximum depths of 2500 feet below the ground

3  surface, the construction of 3900 feet of new roadway, and the maintenance of

4  another 7500 feet of existing Forest Service roads.  Each drill site will require a

5  forty foot by fifty foot drilling pad, which will be constructed by excavating soil

6  and removing vegetation to create a bare, level area on which to conduct the

7  drilling operations.

8  36.    The Forest Service authorized drilling 24-hours a day, 7 days a week, for as

9  many as 300 days.   The drilling sites will be fully illuminated for nighttime

10  operations.

11  37.    The Forest Service approved two types of drilling to be used for the

12  Hardshell Project — reverse circulation drilling and core drilling.  The core drilling

13  operations will require up to 30,000 gallons of water per day.  Water for the core

14  drilling will be hauled from a commercial source in water trucks with up to 4500

15  gallon capacity.   Although recirculation drilling does not require the water

16  resources that the core drilling requires, recirculation drilling will bring

17  groundwater to the surface along with the drill cuttings.

18  38.    Each of the fifteen drilling pads will include a mud pit, or sump, to catch

19  return drill water and cuttings.  Each sump will measure approximately ten feet by

20  fifteen feet and will be six to eight feet deep. The purpose of the sumps is to allow

18

the return drill water to decant suspended material prior to water discharge. Rock in the Hardshell area includes manganese, silver, copper, zinc, and lead, which will be brought to the surface as core samples and drill cuttings and will contaminate sump water.

39.   The water table at the Hardshell site occurs at a depth of 500 feet below the ground surface. The Forest Service approved recirculation drilling for the Hardshell Project. However, AMI knows that recirculation drilling is not practical for the project area because of the relatively shallow depth of the water table.

40.   Access to the exploration area is from the town of Patagonia via Harshaw Road, a county road which runs alongside Harshaw Creek for several miles. The Arizona National Scenic Trail joins Harshaw Road for several miles near the town of Patagonia. Within the project area itself, access is via Forest Roads 5521 and 4687, which lie on Coronado National Forest lands and AMI's private land. Access to the project will require the Company to maintain approximately 7500 feet of Forest Roads 5521 and 4687 by clearing vegetation and blading the road surface. In addition, approximately 3900 feet of new road will be constructed on Coronado National Forest land to provide vehicle access to the drill sites.

41.   The exploratory drilling activity will require use of half- to one-ton pickup trucks, 1000- to 4500-gallon water trucks, a bulldozer, a road grader, an excavator, multiple drill rigs, an air compressor booster truck, pipe trailers, and service/fuel

1   trucks. The pickup trucks will travel to and from the project area daily, for a total

2   of up to twenty-five trips per day. Drill rigs will travel to and from the site only

3   once during the exploration program, but the drill rigs will move from drill site to

4   drill site while they are in the project area. Water trucks would travel to and from

5   the site up to fifteen times per day to deliver water for the drills or as needed for

6   dust control.

7   **H. AMI's Existing Private Lands Exploratory Drilling Project.**

8   42.   The Hardshell Project is a continuation of AMI's existing exploratory

9   drilling operation on its 154-acre private in-holding adjacent to the proposed

10   project site. Wildcat Silver has been drilling on the adjacent private land since

11   2007. Activities on the private lands were not subject to review and approval by

12   the Forest Service.

13   43.   Drilling activity on the private land has required the construction of roads

14   and drilling pads by clearing vegetation and excavating soil. The roads on the

15   private land "switchback" on themselves where the slope is too steep for a direct

16   route. The drilling pad excavation produces overburden, which is either stored in

17   piles or bulldozed downhill. Erosion is apparent on the banks of both the roads

18   and the drilling pads.

19   44.   Drill rigs on the private land discharge drill return water and cuttings via

20   hoses that extend from the drill rigs to the ground. Some of the hoses discharge

20

1  directly onto open ground, while other hoses discharge into sumps on the ground

2  which then overflow or leak.  In at least one case, a sump on the private lands

3  overflowed into a drainage on the site that connects to Harshaw Creek.

4  45.    The road construction, traffic, and drilling on the private land generates

5  noise that can be heard up to three miles from the project area.

6  46.    Nighttime illumination of the drilling sites is visible for several miles.

7  47.    Since the drilling activity began on the private land there has been increased

8  traffic on Harshaw Road.

9  48.    On May 6, 2011, AMI's activities — specifically, an employee working on

10  drilling equipment — at the private lands drilling operation sparked a wildfire.

11  The fire spread to the Coronado National Forest and burned 398 acres of national

12  forest lands.  Also in May 2011, exploratory drilling activity sparked a wildfire in

13  the nearby Santa Rita Mountains at the Rosemont site.  The Rosemont fire was

14  started by a worker who was using a welding torch.

15  49.    The construction and other exploratory drilling activities on AMI's private

16  in-holding adjacent to the Hardshell Project site have significantly decreased the

17  quality and quantity of native vegetation on the site, contaminated drainages with

18  overflows from drilling sumps, caused erosion, generated noise audible as far away

19  as three miles, illuminated the site throughout the night, resulted in a fire that

21

1    burned 398 acres of national forest lands, and significantly increased truck traffic

2    in the Harshaw Creek riparian corridor.

3    **I. The Forest Service's Review of the Hardshell Project.**

4    50.    In general, NEPA requires the Forest Service to prepare an environmental

5    assessment ("EA") to determine whether the effects of an agency action will be

6    significant.  *See* 40 C.F.R. § 1508.9.  If the EA reveals significant effects, the

7    Forest Service must prepare an environmental impact statement ("EIS").  *See id.*

8    If, on the basis of the EA, the Forest Service determines that the action will not

9    have a significant effect, the agency must issue a finding of no significant impact

10    accompanied by a statement of reasons. *See id.* at § 1508.13.

11    51.    The Forest Service may promulgate categorical exclusions to NEPA review

12    for categories of actions "which do not individually or cumulatively have a

13    significant effect on the human environment."  40 C.F.R § 1508.4.  However, an

14    EA or EIS is required when extraordinary circumstances are present "in which a

15    normally excluded action may have a significant environmental effect."  *Id.*  In

16    determining whether extraordinary circumstances exist, the Forest Service should

17    consider resource conditions, including "[f]ederally listed threatened or endangered

18    species or designated critical habitat, species proposed for Federal listing or

19    proposed critical habitat, or Forest Service sensitive species."   36 C.F.R. §

20    220.6(b).  If the Forest Service "determines, based on scoping, that it is uncertain

22

1   whether the proposed action may have a significant effect on the environment," the

2   agency must prepare an EA. *Id.* at § 220.6(c).

3   52.   The Forest Service required that AMI submit a plan of operations for the

4   Hardshell Project.   On March 3, 2011, AMI submitted a plan of operations for

5   exploratory drilling on Federal lands at the Hardshell Project site (the "*Hardshell*

6   *PoO*").   Under the implementing regulations for the Mining Act of 1872, a plan of

7   operations is required for mining activity "if the proposed operations will likely

8   cause a significant disturbance of surface resources."   36 C.F.R. § 228.4(a)(3)

9   (emphasis added); *see also* 36 C.F.R. § 228.4(a)(4).

10   53.   On April 28, 2011, the Forest Service issued a Scoping Notice for the

11   Hardshell Project.   The Scoping Notice was sent to 378 people on the Coronado

12   National Forest mailing list.   On May 27, 2011, the Forest Service issued a

13   Biological Assessment and Evaluation—Management Indicator Species Analysis

14   for the Hardshell Project (the "*2011 Hardshell Biological Assessment*"), which

15   purported to analyze the impacts of the Project on jaguar, ocelot, Mexican spotted

16   owl, and lesser long-nosed bat, forest sensitive species, management indicator

17   species, and migratory birds.   On October 18, 2011, the Forest Service issued a

18   Decision Memo ("*Hardshell Decision Memo*") approving the exploration activities

19   described in the *Hardshell PoO*.   The Forest Service authorized AMI to commence

20   the Hardshell Project immediately in the *Decision Memo*.

54.    The Forest Service exempted the Hardshell Project from NEPA's requirement for an EA or EIS under the categorical exclusion codified at 36 C.F.R. § 220.6(e)(8) applying to the following types of activities:

> Short-term (one year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than one mile of law standard road or use and minor repair of existing roads.

55.    The Forest Service determined that the application of the § 220.6(e)(8) categorical exclusion was not barred by extraordinary circumstances or by the presence of other significant impacts.  The Forest Service determined that the project would have no effect on federally listed threatened or endangered species, designated critical habitat, or Forest Service sensitive species.

56.    The Forest Service did not analyze the cumulative impacts of the Hardshell Project in conjunction with the two other exploratory drilling projects proposed for the same area which are under review by the agency.  The Oz Exploration Pty., Ltd., drilling project is proposed for an area less than 3.5 miles from the Hardshell site, and the Regal Resources (USA), Inc., drilling project is proposed less than one mile from the Hardshell site in Humboldt Canyon.

**J. The Forest Service *2011 Hardshell Biological Assessment.***

57.    In the *2011 Hardshell Biological Assessment*, the Forest Service's analysis of the impacts to the endangered lesser long-nosed bat was limited to three

24

1   sentences.  The Forest Service found that there is a known roost for lesser long-

2   nosed bats approximately 1.5 miles from the Hardshell Project area and that "[b]ats

3   may forage on agave nectar (*Agave palmeri* and *A. parryi*) in the project area."

4   The Forest Service concluded that the Hardshell Project would have no effect on

5   lesser long-nosed bats because the "number of agave plants in the project area is

6   very low."

7   58.    The Forest Service did not survey the project area and vicinity for agave

8   plants.  Additionally, the Forest Service did not analyze the impacts of noise from

9   the drilling operation or illumination of the project area on lesser long-nosed bats.

10   Finally, although the Forest Service concluded that there were "no agave plants in

11   areas where ground disturbance is proposed," it did not address whether lesser

12   long-nosed bats would continue to use "undisturbed" agave plants in the project

13   area, given that they would be surrounded by drilling, night-time illumination, and

14   other human activity.

15   59.    In the *2011 Hardshell Biological Assessment*, the Forest Service's analysis

16   of impacts to jaguar relied on incorrect or outdated information, ignored new

17   information, incorrectly assessed the habitat characteristics of the project vicinity,

18   and ignored the function of the Patagonia Mountains as a wildlife corridor for

19   jaguar.

1        a.      The Forest Service relied on an outdated opinion of the United States

2    Fish and Wildlife Service ("FWS") regarding the designation of critical habitat for

3    jaguar.   Contrary to the Forest Service's assertion, FWS determined that the

4    designation of critical habitat for jaguar was "prudent" in 2010 and is currently in

5    the process of preparing a proposed designation.

6        b.      The Forest Service stated that there was only one historical jaguar

7    sighting from the Patagonia Mountains.   However, a least six jaguars have been

8    reported in the Patagonia Mountains during the 20th century.   Additionally, the

9    United States Border Patrol reported a jaguar sighting in the Santa Rita Mountains

10   in June 2011, and a hunter photographed a jaguar in approximately thirty miles

11   northeast of the Patagonia Mountains in November 2011.   The Forest Service

12   incorrectly implies that researchers have conducted "intensive surveys" for jaguars

13   in the Patagonia Mountains when, in fact, the Patagonias have been the subject of a

14   limited survey effort.

15       c.      The Forest Service cited a 1999 publication by Dr. Rabinowitz for the

16   conclusions "that there is a lack of evidence to support the presence of a significant

17   United States [jaguar] population" and "that the southwestern United States has

18   been never more than marginal habitat at the extreme northern limit of the jaguar's

19   range" (internal quotations omitted).   However, more recent statements of Dr.

20   Rabinowitz, summarized by the district court in *Ctr. for Biological Diversity v.*

26

1    *Kempthorne*, 607 F.Supp. 2d 1078, 1090 (D. Ariz. 2009), "suggest [Dr.

2    Rabinowtiz's] departure from these earlier statements."

3        d.      The Forest Service's analysis of jaguar impacts incorrectly stated that

4    the habitat in the project vicinity does not include "water, dense vegetation, and

5    riparian corridors."

6        e.      The Forest Service ignored the value of the Patagonia Mountains as a

7    wildlife corridor for jaguars traveling between the United States and Mexico.

8    Jaguars have been documented in the Sierra Azul Mountains in Mexico, merely

9    thirty miles south of the Patagonia Mountains.  At the same time, development

10   along the U.S.-Mexico border has drastically reduced the corridors through which

11   these and other species can migrate into the United States.  In the *2011 Hardshell*

12   *Biological Assessment*, the Forest Service cited a study by McCain and Childs

13   (2008), but failed to include the author's observation that the Patagonia Mountains

14   are one of the three remaining corridors where human development and border

15   surveillance do not interfere with jaguar migration.

16   60.     The Forest Service concluded that the Hardshell Project would have no

17   effect on jaguars because of (a) "[t]he lack of a jaguar sighting in the Patagonia

18   Mountains in over forty year [*sic*] despite intensive surveys by experts;" (b) "the

19   absence of water, dense vegetation, and riparian corridors within the project area;"

1    and (c) "the amount of ground disturbance and vegetation loss that would result

2    from the proposed action is minimal."

3    61.    In the *2011 Hardshell Biological Assessment*, the Forest Service concluded

4    that the Hardshell Project would have no effect on ocelots because of the "absence

5    of apparently suitable habitat in the project area," based on ocelot habitat

6    associations documented in south Texas.  Ocelots occurring in the two regions are

7    distinct subspecies and utilize different habitats.  Additionally, the Forest Service

8    ignored the probability that ocelots use the Patagonia Mountains as a migration

9    corridor between Mexico and the United States.

10   62.    In the *2011 Hardshell Biological Assessment*, the Forest Service concluded

11   that the Hardshell Project would have no effect on Mexican spotted owl critical

12   habitat based on the absence of the following constituent elements of Mexican

13   spotted owl critical habitat in the project area:

14           a. "A range of tree species, including mixed conifer, pine-oak, and

15              riparian forest types, composed of different tree sizes reflecting

16              different ages of trees, 30% to 45% of which are large trees (dbh $\geq$

17              12 )"

18           b. "A shade canopy created by the tree branches covering 40% or more

19              of the ground"

20           c. "Large (dbh $\geq$ 12  dead trees (snags)"

28

The Forest Service inaccurately assessed the habitat characteristics of the project area. A significant portion of the project area does contain the listed constituent elements of Mexican spotted owl critical habitat and was ignored or overlooked in the Forest Service's analysis. Additionally, the Forest Service incorrectly stated that the nearest Mexican spotted owl Protected Activity Center is "approximately 2 miles away" from the Hardshell Project and that "[a]s such, the [Protected Activity Center] would not be within the zone of noise impacts resulting from heavy equipment use." In fact, the nearest Mexican spotted owl Protected Activity Center is less than a mile away from the Hardshell Project.

63.    In the *2011 Hardshell Biological Assessment*, the Forest Service incorrectly stated that the project area does not contain "perennial or intermittent streams" and that "[t]here is not riparian vegetation at the proposed drill sites or roads." Contrary to the Forest Service's statements, the project area does contain an intermittent stream and at least one of the approved drill locations is only 0.1 miles from the Harshaw Creek riparian corridor.

64.    The Forest Service's analysis of impacts to forest sensitive species does not consider the impacts to these species from noise and illumination of the drilling sites.

65.    The Forest Service determined that the Hardshell Project would have no effect on Management Indicator Species ("MIS"), without offering any explanation

1   of why the MIS inventory for the Hardshell site revealed that fourteen of the thirty-

2   four MIS either occur or have suitable habitat in the project area or the nearby

3   Harshaw Creek riparian area along which all traffic to the Hardshell site would

4   travel.

5   <strong><u>CLAIMS FOR RELIEF</u></strong>

6   <strong>First Claim for Relief:</strong>
7   <strong>Violation of NEPA and the APA</strong>
8   <strong>The Forest Service Ignored Significant Impacts: It Failed to Consider the</strong>
9   <strong>Impacts of Wildcat Silver's Exploratory Drilling on Adjacent Private Lands</strong>
10

11   66.    The plaintiffs incorporate each of the foregoing allegations as if they were

12   fully realleged herein.

13   67.    The Forest Service ignored the significant impacts of AMI's exploratory

14   drilling on its private in-holding adjacent to the project area and erroneously

15   determined that extraordinary circumstance were not present for the Hardshell

16   Project.  Therefore, its approval of the Hardshell Project as a categorical exclusion

17   to NEPA review is arbitrary and capricious and violates NEPA, 42 U.S.C. § 4321,

18   *et seq.*, the NEPA implementing regulations, 40 C.F.R., Part 1500, *et seq.*, the

19   Forest Service's NEPA regulations, 36 C.F.R., Part 220, and the APA, 5 U.S.C. §

20   701, *et seq.*

21   68.    AMI's drilling operations on adjacent private lands resulted in sump

22   overflows to an unnamed tributary of Harshaw Creek, a wildfire that burned 398

30

1   acres of public lands, erosion from road cuts and drilling pads on steep slopes, the

2   clearing of most of the native vegetation from the entirety of a 154-acre private

3   lands parcel, and increased truck traffic on Forest Service roads through the

4   riparian corridor along Harshaw Creek.

5   69.     In its *Decision Memo*, the Forest Service describes the drilling that will

6   occur on public land as "a continuation of the currently ongoing drilling activity on

7   [Arizona Minerals, Inc.'s] adjacent private land."   Thus, the impacts from

8   exploratory drilling on AMI's private land in-holding are likely to occur on

9   national forest lands should AMI commence the Hardshell Project.  These impacts

10  are significant and require analysis in an EA or EIS under NEPA.

11  70.     Because AMI's private lands drilling project is located adjacent to the

12  national forest lands approved for the Hardshell Project, the Forest Service knew of

13  these impacts at the time it approved the project as a categorical exclusion to

14  NEPA review.

15          **Second Claim for Relief:**

16

17          **Violation of NEPA and the APA**
18  **The Forest Service Ignored Significant Impacts: Its Analysis of Impacts to**
19  **Threatened and Endangered Species is Arbitrary and Capricious**

20

21  71.     The plaintiffs incorporate each of the foregoing allegations as if they were

22  fully realleged herein.

31

72.     The Forest Service's analysis of the impacts of the Hardshell Project on jaguar, ocelot, Mexican spotted owl, lesser long-nosed bat, forest sensitive species, and management indicator species is based on erroneous site information, fails to consider important aspects of the problem, ignores the relevant factors, and relies on other outdated and incorrect information.  Based on this analysis, the Forest Service erroneously determined that significant impacts and extraordinary circumstances are not present for the Hardshell Project.  Therefore, its approval of the Hardshell Project as a categorical exclusion to NEPA review is arbitrary and capricious and violates NEPA, 42 U.S.C. § 4321, *et seq.*, the NEPA implementing regulations, 40 C.F.R., Part 1500, *et seq.*, the Forest Service's NEPA regulations, 36 C.F.R., Part 220, and the APA, 5 U.S.C. § 701, *et seq.*

73.     The Forest Service's factual determinations about the project area are plainly erroneous.  The Forest Service (a) mischaracterized the canopy cover, tree size, and tree species diversity for a substantial portion of the project area; (b) ignored or overlooked the presence of agave plants in the project area; and (c) failed to acknowledge the presence of an intermittent stream in the project area and the presence of riparian habitat adjacent to the project area.

74.     The Forest Service's analysis of impacts to lesser long-nosed bat ignored the substantial presence of agave in the project vicinity and failed to consider the impacts of noise and illumination on the drilling site.

32

75.    The Forest Service's analysis of impacts to jaguar relied on incorrect or outdated information, ignored new information, incorrectly assessed the habitat characteristics of the project vicinity, and ignored the function of the Patagonia Mountains as a wildlife corridor for jaguar.

76.    The Forest Service's analysis of impacts to ocelot relied on habitat information that is not applicable to Sonoran ocelots, ignored a Border Patrol report of an ocelot in the Patagonia Mountains in 2009, and ignored the function of the Patagonia Mountains as a wildlife corridor for ocelots traveling between Mexico and Arizona.

77.    The Forest Service's analysis of impacts to Mexican spotted owl relied on incorrect information about the habitat characteristics in the project area and an incorrect calculation of the distance between the drill sites and the nearest Protected Activity Center.

78.    The Forest Service failed to analyze impacts to forest sensitive species, even though the project area contains suitable habitat for nineteen of the thirty-four Forest Service sensitive species identified by the Forest Service in the *2011 Hardshell BA.*

### Third Claim for Relief:

### Violation of NEPA and the APA
### The Forest Service Ignored Significant Impacts: It Failed to Consider the Impacts of Other Exploratory Drilling Projects Proposed in the Vicinity

79.   The plaintiffs incorporate each of the foregoing allegations as if they were fully realleged herein.

80.   The Forest Service ignored the significant cumulative impacts of the Hardshell Project and the two other exploratory drilling projects under review by the agency — the Oz Exploration Pty., Ltd., drilling project and the Regal Resources (USA), Inc., drilling project — and projects on private lands and erroneously determined that extraordinary circumstance were not present for the Hardshell Project. Therefore, its approval of the Hardshell Project as a categorical exclusion to NEPA review is arbitrary and capricious and violates NEPA, 42 U.S.C. § 4321, *et seq.*, the NEPA implementing regulations, 40 C.F.R., Part 1500, *et seq.*, the Forest Service's NEPA regulations, 36 C.F.R., Part 220, and the APA, 5 U.S.C. § 701, *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request that this Court:

A.   Declare that the Forest Service's approval of the Hardshell Project as a categorical exclusion to NEPA review violates NEPA, the NEPA implementing regulations, the Forest Service's NEPA regulations, and the APA.

B.   Vacate the Forest Service's approval of the Hardshell Project as a categorical exclusion and remand the matter to the agency for review in

1   compliance with NEPA, the NEPA implementing regulations, the Forest Service's

2   NEPA regulations, and the APA.

3   C.      Issue an injunction halting the Hardshell Project until the defendants'

4   violations of NEPA, the NEPA implementing regulations, the Forest Service's

5   NEPA regulations, and the APA are fully remedied.

6   D.      Award plaintiffs their reasonable attorneys' fees and costs for this action

7   pursuant to 28 U.S.C. § 2412.

8   E.      Grant plaintiffs such other and further equitable and injunctive relief as may

9   be just and proper.

10  Respectfully submitted this the 22nd day of December 2011.

/s/ Gregory Buppert
Gregory Buppert (Tenn. BPR No. 024340[2])
*Pro hac vice* application filed with this complaint.
Michael Senatore (D.C. Bar No. 453116)
*Pro hac vice* application forthcoming.
DEFENDERS OF WILDLIFE
1130 17th Street, N.W.
Washington, DC 20036-0046
Telephone: 202.682.9400
Fax: 202.682.1131
gbuppert@defenders.org
msenatore@defenders.org

*Counsel for Plaintiffs.*

---

[2] Application for admission to the Bar of the District of Columbia pending; practice limited to the courts of the United States as provide in D.C. App. Rule 49(c).

35